**IRELL & MANELLA LLP**
Steven A. Marenberg (101033)
smarenberg@irell.com
Victor Jih (186515)
vjih@irell.com
Stephen M. Payne (310567)
spayne@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:   (310) 203-7199

**MITCHELL SILBERBERG & KNUPP LLP**
Adam Levin (156773)
axl@msk.com
Jeremy Mittman (248854)
j2m@msk.com
Jean Pierre Nogues (84445)
jpn@msk.com
2049 Century Park E., 18th Floor
Los Angeles, CA 90067
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

Attorneys for Plaintiff
UNITED TALENT AGENCY, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED TALENT AGENCY, LLC,<br><br>        Plaintiff,<br><br>    vs.<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and WRITERS GUILD OF AMERICA, EAST, INC.,<br><br>        Defendants. | Case No. 2:19-cv-05585<br><br>**COMPLAINT FOR VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**<br><br>**DEMAND FOR JURY TRIAL** |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

Plaintiff United Talent Agency, LLC ("UTA") alleges against Defendants Writers Guild of America, West, Inc. ("WGAW") and Writers Guild of America, East, Inc. ("WGAE") (together, "WGA") violation(s) of Section 1 of the Sherman Antitrust Act. This Court has jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

## INTRODUCTION

1. On April 13, 2019, WGA radically upended over 40 years of settled, mutually-beneficial business relationships between Hollywood writers and the talent agencies that represent them. On that date, in what WGA President David Goodman described as a "power grab" designed to "divide and conquer" talent agencies, WGA adopted and began to enforce a so-called "Code of Conduct" that requires writers to fire the talent agents who refused to bend the knee to WGA's demand that talent agencies abandon the agencies' business practice of "packaging" and their affiliations with content production companies. Writers who fail to follow the dictates of the WGA and refuse to join the boycott face discipline from WGA that could substantially and irreparably harm their careers.

2. When it so acted, WGA placed the interests of a few well-heeled individuals above the interests of its membership. As explained below and as WGA has acknowledged, the vast majority of writers benefit from packaging arrangements by reaping the creative and financial rewards of writing engagements without having to pay a traditional 10% commission on their income to the talent agents who procured these engagements. Likewise, WGA undermined the interests of writers who benefit from the increased opportunities and more favorable economic terms offered to writers, directors, actors and other Hollywood talent by agency-affiliated production companies, when compared to the terms offered by the traditional industry television studios.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 1 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

3.     More to the point, WGA not only acted contrary to the interests of writers, and other members of the Hollywood creative community, it also acted illegally. WGA has exceeded its lawful authority as a labor union by organizing an illegal group boycott against UTA and other talent agencies. WGA's boycott, attempting to impose a blanket prohibition on talent agency packaging and agency affiliated production companies, undermines lawful competition and far exceeds any limited exemption WGA has under the antitrust laws. To the contrary, WGA's ban has harmed competition in the packaging market and other markets that WGA has no authority to regulate, has harmed UTA and other talent agencies, and has harmed the very writer-members whom the WGA purports to represent.

4.     WGA's group boycott is a classic, per se violation of the Sherman Act. UTA filed this suit to enjoin WGA's illegal conduct and to recover treble damages for the harm WGA's boycott has caused. UTA also seeks to recover its attorney's fees and litigation costs in bringing this suit.

## **PARTIES**

5.     Plaintiff UTA is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in Beverly Hills, California.

6.     Defendant WGAW is a California non-profit corporation headquartered in Los Angeles, California. WGAW is a labor union representing thousands of writers in the motion picture and television industries.

7.     Defendant WGAE is a New York non-profit corporation headquartered in New York City, New York.  WGAE is a labor union representing thousands of writers in the motion picture and television industries. Writers who live east of the Mississippi River at the time of their initial membership are enrolled as members of WGAE, whereas those to the west are members of WGAW.

8.     WGAW and WGAE work in tandem to represent their members. Among other things, WGAW and WGAE negotiated and entered into an industrywide

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 2 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

collective bargaining agreement, the "Minimum Basic Agreement" or "MBA," with the Alliance of Motion Picture and Television Producers, Inc. ("AMPTP"), a multi-employer collective bargaining representative for motion picture and television producers. The MBA sets a minimum compensation scale for writers for film and television production, though writers are free to negotiate individual compensation above these minimums, and may be represented in those negotiations by licensed talent agents.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

10.     This Court has personal jurisdiction over WGAW under 15 U.S.C. § 15 because WGAW resides in this District.

11.     This Court has personal jurisdiction over WGAE because it is a corporation that transacts business in this District under 15 U.S.C. § 22. WGAE performs services on behalf of its members in this District; in conjunction with WGAW, WGAE entered into the Minimum Basic Agreement with production companies represented for the purposes of collective bargaining by the AMPTP, many of which are located in this District; and, in conjunction with WGAW, WGAE has sought to impose a new Code of Conduct on the Association of Talent Agents ("ATA"), which is also located in this District.

12.     The Court also has personal jurisdiction over WGAW and WGAE because they are engaged in a conspiracy that is directed at, and has a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities located in this District.

13.     Venue is proper in this District under 15 U.S.C. § 15 and 28 U.S.C. §§ 1391(b), (c) and (d) because WGAW and WGAE are subject to this Court's personal jurisdiction with respect to this action, and a substantial part of the events giving rise

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 3 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

to the claims for relief stated herein occurred in this District. Furthermore, UTA has suffered and will continue to suffer harm in this District as a result of WGA's actions.

## FACTUAL BACKGROUND

14.     UTA is a global talent agency representing many talented individuals working in film, television, news, music, sports, theater, fine art, literature, social media, video games, podcasts, and other media, including writers for film and television. UTA employs many of the industry's most experienced talent agents and strives to foster a culture of entrepreneurship, working not only to secure employment for its clients but also to help them launch new TV series and films, sell screenplays, develop companies, find financing, and more. UTA's success is a testament not only to the talent of the writers and other artists it represents, but also to UTA's singular focus on putting clients first.

15.     UTA is involved in the process of developing television and film content, working closely with its clients to put together "packages" of the key elements necessary to create new shows, including talent (such as writers, directors, and actors), scripts, and concepts. UTA pitches these packages, always with the knowledge and consent of its clients (including writers) to production companies, who purchase the package in exchange for a fee and use it as the core for a new show or film. When UTA receives a package fee from a production company, it forgoes charging a commission to its clients.

16.     In addition, in late 2018, UTA entered into an affiliation with Media Rights Capital ("MRC"), a production company, to increase competition with traditional studios and provide additional opportunities for UTA's clients and other artists. The recent UTA-MRC affiliation, known as Civil Center Media, has consistently offered writers, directors, actors and others more favorable terms than those traditionally offered by Hollywood studios. No UTA client is pitched to MRC or Civic Center Media without his or her knowledge and consent. UTA's relationship

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 4 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1   with Civic Center is always disclosed, as are options for employment with other

2   studios, and UTA encourages its clients to retain independent attorneys to review

3   deals with Civic Center (and, in fact, any other deal for the clients' services).

4          17.    WGA has been aware of and has expressly agreed to the practice of

5   packaging for over 40 years, and also permitted talent agencies to participate in

6   content production. In 1976, WGA and the Association of Talent Agents ("ATA")

7   (then known as the Artists' Managers Guild), of which UTA is one of over 100

8   member agencies, entered into the Artists' Manager Basic Agreement ("AMBA"),

9   attached hereto as Exhibit A. The AMBA expressly permitted packaging, *see* AMBA

10  § 6, and did not prohibit agencies, like UTA, from affiliating with production

11  companies. Until April 2019, WGA franchised UTA and other talent agencies to

12  represent its members pursuant to the terms of the AMBA.

13         18.    UTA's writer-clients also knew of, agreed to, and benefitted from

14  packaging. UTA always discloses packaging arrangements to its writer clients (and

15  other clients), and obtains their consent before submitting them for a packaged deal.

16  If a writer or other client prefers not to participate in packaged shows or films, then

17  UTA does not package that client and will instead charge a commission.

18         19.    WGA terminated the AMBA on April 12, 2019, and demanded that all

19  previously franchised talent agencies agree to a new "Code of Conduct," attached

20  hereto as Exhibit B, that imposed a blanket ban on packaging and agency affiliated

21  content companies. UTA and over one hundred other agencies refused to capitulate

22  to WGA's ukase, and WGA subsequently instituted its group boycott against all non-

23  compliant agencies. WGA's boycott seeks to upend longstanding industry practices

24  and has harmed UTA and the very members the WGA claims to represent.

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 5 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1
2

### A.   UTA's Longstanding Engagement in Content Packaging Benefits its Clients and the Industry

3      20.   Packaging is a long-standing practice, dating back to at least the 1950s,

4   through which talent agencies assemble a "package" of the key elements needed to

5   produce a new television show or film, including talent (e.g., writers, actors, and

6   directors), and associated intellectual property (such as scripts, treatments, and

7   concepts), and then sell the rights to that package to a production company. In doing

8   so, talent agencies provide a valuable service to production companies by facilitating

9   the development of new content, while also benefitting agency clients. Writers—and

10  the other talent who agree to be included in any series subject to a packaging deal—

11  whether or not any individual was part of the original package—do not pay any

12  commission to their agents (ordinarily up to 10%) in a packaged deal. Instead, the

13  agency is compensated directly for the service it provides in the form of a packaging

14  fee paid by the production company.

15     21.   Packaging arrangements are individually negotiated and vary

16  significantly from package to package, as does the packaging fee. However, a

17  packaging fee generally includes (i) an upfront license fee (usually a fixed dollar

18  amount paid per episode) and (ii) a backend fee paying the agency a percentage of

19  certain profits earned by the show. Packages have sometimes also included a deferred

20  license fee, but such fees are increasingly rare and almost never result in any payment

21  even when agreed to by the talent agency and production company. Backend fees are

22  also rarely paid by the production company, as they are earned only on the few most

23  successful shows. For example, upon information and belief, over the past 5 years,

24  only about 5 series on the big four broadcast networks have achieved backend fees.

25  WGA is thus wrong when it alleges that package fees invariably involve a "3-3-10"

26  formula—3% upfront license fee, 3% deferred license fee, and 10% backend fee, for

27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

the reasons described above and because packaging fees are not typically calculated as a percentage of a show's budget.

22.     UTA and other agencies generally provide ongoing services to a production company as part of a package deal. For example, UTA will often assist in developing the project after the package is purchased, and suggest staffing throughout the run of the show.

23.     Packaging fees are paid per show, not per artist, and, as noted, UTA typically receives the same packaging fee regardless of how many of its clients are included in the initial package or are later hired to work on the packaged show. Hence, when UTA enters into a packaging deal with a production company for a project, it is assuming a large degree of business risk. For all except the rare successful show that earns significant backend profits, UTA's packaging fee is often similar to (and in many cases significantly less than) what UTA would have earned from charging its clients a commission based on their earnings.

24.     Packaging is not the means by which talent agents negotiate the terms and conditions of writers' employment. Rather, packaging negotiations generally focus on the terms of the production company's bid for the show and the amount of the agency's packaging fee. UTA separately negotiates client compensation, and such negotiations are completely independent from the packaging deal. Indeed, except for those clients who are part of the original package, most clients are hired (and their salaries and other terms negotiated) long after the packaging agreement has been negotiated. Throughout this process, UTA aims to negotiate the best possible terms for writers and all other clients it represents; UTA's receipt or non-receipt of a packaging fee has no impact at all on the negotiation process, UTA's vigorous advocacy on behalf of its clients, or the ultimate deal terms negotiated for the services of its clients, including, but not limited to, writers' compensation.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 7 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

25.     Packaging benefits UTA's clients, including writers, both creatively and financially. For example, packaging increases output of television series and films by lowering the barriers to getting a new show off the ground, creating employment opportunities for writers and other artists that otherwise would not have existed. Upon information and belief, approximately 90% of new television shows are now packaged, and the number of new television series released each year has increased over 40% in the last five years.

26.     Packaging also benefits UTA's clients by giving them an advantage in hiring. Writers (and other clients) included in a package benefit from the attractiveness of the package as a whole, and shows are more likely to be purchased by a production company when packaged. Similarly, UTA is better able to place writers and other UTA clients on shows that it has packaged, including because such show will already involve at least some UTA clients and studios look to the packaging agency to staff and help cast a show that the agency packaged.

27.     UTA's involvement in packaging also increases the net compensation for the vast majority of writers and other UTA clients, as writers and other clients who are part of a packaged show pay no commission to UTA. Because a traditional commission is 10%, this savings is often significant, and provides a guaranteed benefit to writers and other clients regardless of the ultimate success of the show.

28.     Despite its longstanding endorsement of packaging, WGA now claims that packaging always harms writers and creates a conflict of interest that incentivizes agents to maximize their own fee rather than writers' compensation. This contention is false. UTA has every incentive to provide the best possible representation to its clients, most notably that any client who is not satisfied is free to leave (and will leave) UTA for one of hundreds of competing talent agencies. Packaging does nothing to change that incentive, and can even further align the interests of UTA and its clients by creating shared incentives for content creation.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 8 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

29.     WGA's claim that packaging creates a conflict of interest is also contradicted by decades of experience under the AMBA, which included a dispute resolution procedure for writers or the WGA to seek redress for any harmful conflict. *See* AMBA § 3, 8. Upon information and belief, not even one writer has ever filed a claim against UTA based on any claimed failure by UTA to act in her/his best interests, shattering WGA's claim that packaging regularly harms writers.

30.     The WGA's notion that a long-standing, mutually-beneficial, commercial practice that everyone has always treated as something to be *negotiated* in good faith, has suddenly been discovered by WGA (a sophisticated party if ever there were one) to actually have been *illegal* all these many years, and that the agents who behaved in conformity with the WGA's own agreement all this time now deserve to be *punished* for doing so, is so obviously preposterous that it cannot possibly be correct—and it is not.

## B.     UTA's Affiliation with Civic Center Increases Competition and Benefits Writers

31.     Pursuant to UTA's affiliation with Media Rights Capital ("MRC"), known as Civic Center Media ("Civic Center"), UTA acquired a minority financial interest in certain shows produced and financed by Civic Center. UTA and Civic Center are separate companies, and operate independently of each other. UTA has no role in the management or operations of Civic Center, which is run entirely by MRC executives and maintains separate offices from UTA. To date, UTA's arrangement with Civic Center has resulted in the production of at least one new television series, and several others have been sold to networks and are currently in development.

32.     UTA's agreement with MRC/Civic Center is not exclusive. MRC/Civic Center is free to, and does, hire clients of agencies other than UTA and purchase shows not packaged by UTA (or co-packaged by UTA and another agency or agencies), just as it did before its agreement with UTA. Similarly, unless a client

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 9 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

prefers otherwise, UTA continues to market packages and pursue employment for its clients with studios other than MRC and Civic Center. This is a competitive process and Civic Center obtains business from UTA or its clients only if it makes the best offer, and only if UTA's clients agree to that offer.

33.     UTA's affiliation with MRC/Civic Center benefits writers and other UTA clients by expanding the output of television series, increasing competition with traditional production companies, creating new employment opportunities, and providing better terms to writers. For example, Civic Center offers better compensation to writers than traditional production companies, including higher wages, increased backend compensation, and better script fees. Civic Center also charges lower fees and pursues more lucrative distribution terms than traditional production companies, further increasing clients' backend compensation. Upon information and belief, Civic Center's presence in the market is forcing traditional production companies to improve their own offers to writers and other talent, increasing compensation and employment for UTA's clients.

34.     Until it implemented its group boycott, and for the 40 plus years the AMBA was the operative agreement between the WGA and talent agencies, WGA did not prohibit talent agencies such as UTA from establishing affiliations with production entities. Although WGA now contends that entities such as Civic Center harm writers and create conflicts of interest, this is false. UTA's affiliation with MRC/Civic Center is disclosed to all clients, and UTA obtains informed consent from its clients before pursuing any deal with MRC/Civic Center. Further, UTA maintains strict separation of agents from MRC/Civic Center and does not share confidential client information with Civic Center. UTA also encourages clients to obtain independent legal representation to review any deals with Civic Center, and conducts all negotiations with Civic Center at arms-length. Again, WGA's notion that it has

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 10 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1  just recently discovered that these long-standing and properly disclosed practices are

2  somehow actually *illegal* is utterly preposterous.

3      **C.    WGA Has Organized An Unlawful Group Boycott Against UTA**

4             **And Other Talent Agencies**

5      35.    In February 2018, WGA announced that it intended to terminate the

6  AMBA and institute a new "Code of Conduct" imposing a blanket ban on packaging

7  and agency affiliated content producers. The Association of Talent Agents ("ATA")

8  attempted to negotiate with the WGA, and made several detailed proposals that would

9  preserve the ability of talent agencies to engage in packaging and to affiliate with

10  production companies, but with tailored protections for writers providing means to

11  remedy any conflicts of interest that might be asserted. A copy of ATA's proposal is

12  attached hereto as Exhibit C. The WGA summarily rejected ATA's proposals.

13      36.    On April 13, 2019, WGA unilaterally enacted its new Code of Conduct,

14  and stated that all talent agencies must comply with its terms in order to represent

15  WGA members. The Code of Conduct includes the following provisions concerning

16  packaging and agency affiliated production companies (Ex. B, at 2):

17             a.    No Agent shall have an ownership or other financial interest in,

18                   or shall be owned by or affiliated with, any entity or individual

19                   engaged in the production or distribution of motion pictures.

20             b.    No Agent shall have an ownership or other financial interest in,

21                   or shall be owned by or affiliated with, any business venture that

22                   would create an actual or apparent conflict of interest with

23                   Agent's representation of a Writer.

24             c.    No Agent shall derive any revenue or other benefit from a

25                   Writer's involvement in or employment on a motion picture

26                   project, other than a percentage commission based on the

27                   Writer's compensation or fee.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 11 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1    d. No Agent shall accept any money or thing of value from the

2      employer of a Writer.

3  37. Immediately after enacting its new Code of Conduct, WGA began to

4 implement a group boycott of non-compliant agencies and instructed its members that

5 they were prohibited from being represented by an agent who does not agree to the

6 Code of Conduct. As dictated by WGA: "No Current WGA member can be

7 represented by an agency that is not franchised by the Guild in accordance with

8 Working Rule 23." Exhibit D, Agency Code of Conduct Implementation FAQ, at 1.

9 Working Rule 23 provides that members can only be represented by agencies that

10 sign a franchise agreement with WGA, which as of April 13 "is the WGA Agency

11 Code of Conduct." *Id.*

12  38. WGA's leadership has instructed WGA members that they must join the

13 "collective action by WGA members" to refuse to deal with any agents or agencies

14 who do not agree to the Code of Conduct. *See* Ex. D, Agency Code of Conduct

15 Implementation FAQ, at 1 ("If my agency does not sign the Code of Conduct, do I

16 have to tell them they cannot represent me? Yes, but you will do so as part of a

17 collective action by WGA members."). WGA has threatened union discipline against

18 any of its members who continue to work with such "non-franchised" agencies and

19 agents. *See id.*, at 4-5 ("How will Working Rule 23 be enforced? … [A]fter the Guild

20 decides on collective action members are obligated to follow Guild rules, which will

21 be enforced. … Article X of the WGAW and WGAE Constitutions guides Guild

22 disciplinary procedures."); *see also* Rules for Implementation of the WGA Code of

23 Conduct for Agents, attached hereto as Exhibit E, at ¶ 4 ("Members in violation of

24 Working Rule 23 shall be subject to discipline in accordance with Article X of the

25 WGAW Constitution.").

26  39. WGA's directive to its members to boycott talent agencies that do not

27 submit to the Code of Conduct applies not only to writers, but also to WGA members

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 12 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

who are acting in their capacity as producers. *See* Ex. D, Agency Code of Conduct Implementation FAQ (Q. What if I'm a TV writer/producer? A. [P]roducing services are deemed part of writing when performed by writer-producers . . . under Working Rule 23 non-franchised agents cannot represent WGA writers with respect to these hyphenate services, and a member who has historically been employed as a hyphenate cannot avoid the Guild's jurisdiction by re-labeling a contract as a producer-only deal."). WGA's Code of Conduct also demands that UTA and other agencies disclose the confidential terms of producing deals made with production companies by clients who are also writers, even if the agency's clients do not consent.

40.     Upon information and belief, WGA is compiling a record of those members who fire their non-franchised agents, and those members who continue to work with their non-franchised agents. The latter group will be subject to discipline by a tribunal of WGA members, in what is likely to be an expedited process, and the penalty could be a significant monetary fine or expulsion from WGA. WGA members who choose to work with a non-franchised talent agent risk becoming blacklisted if they refuse to join WGA's boycott.

41.     By reason of the above conduct, WGA has organized a group boycott in which all agency packaging and content affiliation have been banned, and both willing and coerced writer-members have agreed to boycott UTA and other talent agents who will not submit to WGA's prohibitions on packaging and content affiliates. To date, over 1,700 of UTA's writer-clients have terminated UTA due to WGA's group boycott. WGA claims that, in total, 7,000 writers have terminated their agents as a result of WGA's group boycott, representing approximately 80% of WGA writers represented at the time of the boycott.

42.     WGA has also combined with non-labor entities to facilitate and enforce its unlawful group boycott, including producers (showrunners), certain talent agencies, and lawyers and managers.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 13 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

43.     First, WGA has combined with producers (showrunners) to enforce its boycott, demanding that showrunners refuse to do business with any agency that has not agreed to WGA's Code of Conduct. Producers and showrunners (including those who may also act as writers) are non-labor entities because they oversee production on behalf of a production company and are responsible for hiring and supervising other talent, managing the budget, overseeing filming and post-production, and other tasks. Upon information and belief, some producers and showrunners have joined WGA's ban, and have refused to accept packaging proposals from UTA and other non-franchised agencies. The WGA also has attempted to combine with production companies to enforce its boycott. *See* Exhibit F (WGA Proposal to the Alliance of Motion Picture and Television Producers ("AMPTP")). To date, UTA is informed and believes that production companies have resisted joining the boycott on the grounds that it "would subject [AMPTP], the WGA and individual writers to a substantial risk of liability for antitrust violations," but that WGA continues to unlawfully threaten and pressure these production companies to join its unlawful group boycott.

44.     Second, WGA has entered into agreements with certain talent agencies that will agree to be bound by the Code of Conduct, that permit those agencies to represent WGA members while maintaining and enforcing the boycott against non-consenting agencies. These agencies have obtained an anticompetitive advantage by virtue of their facilitation of the boycott, as such agencies may continue to represent writers and may poach clients from agencies that are currently subject to the boycott, while their competitors are excluded from the market.

45.     Third, WGA has combined with lawyers and talent managers to sustain its boycott and mitigate the harm that WGA's actions have caused to its own members. Specifically, on March 20, 2019, WGA purported to temporarily authorize managers and lawyers to procure employment and negotiate overscale terms and conditions of employment for individual writers. But, under California, New York,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 14 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

and certain other state laws, only licensed talent agents may lawfully represent writers in their individual negations with production companies. WGA's purported act of "delegation" has conferred an anticompetitive benefit on these unlicensed lawyers and managers, purportedly conferring on them non-existent authority to engage in representation without complying with the licensing requirements applying to licensed talent agencies and without competition from talent agencies that are subject to WGA's group boycott.

46.     Upon information and belief, WGA has also adopted a policy of (i) paying the damages of any lawyers or talent managers who act pursuant to WGA's purported delegation and are sued by talent agencies or clients for violating the California Talent Agency Act ("TAA"), and (ii) reimbursing unlicensed lawyers and managers who act pursuant to its delegation but are not paid by a writer (and who as unlicensed entities otherwise could not recover from that writer). Upon information and belief, these policies have caused, induced, and/or encouraged unlicensed lawyers and managers to combine with WGA's unlawful group boycott and violate the TAA.

## **CLAIM ONE**

### **(Violation of Section 1 of The Sherman Antitrust Act – 15 U.S.C. § 1)**

47.     UTA incorporates by reference and re-alleges all previous paragraphs as if fully set forth herein.

48.     WGA's group boycott and concerted refusal to deal with talent agents who will not agree to the Code of Conduct is a per se violation of Section 1 of the Sherman Act (15. U.S.C. § 1).

49.     WGA has entered into a contract, combination, or conspiracy to unreasonably restrain trade and impose a group boycott on non-compliant talent agencies, including with (1) its writer-members, some of whom are independent contractors and employers, (2) producers and showrunners, (3) certain talent agencies, and/or (4) unlicensed lawyers and managers.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 15 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

50.     WGA's group boycott also qualifies as an unlawful restraint of trade under the rule of reason. Under the rule of reason, the Court would weigh the anticompetitive harm caused by WGA's restrictions against any ostensible procompetitive benefit of those same restrictions. This inquiry would include defining the relevant economic market(s) in which WGA is restraining competition, assessing WGA's market power in these markets, and considering whether WGA could achieve any ostensible procompetitive benefit of its agency packaging and agency-affiliate content bans in a less restrictive manner.

51.     WGA has unreasonably restrained competition in the market for the development of scripted television series and movies in the United States by abusing and leveraging its power in the labor market for writers to eliminate the agencies as providers of packaging, reducing output of new shows and harming artists who benefit from packaging. Writers are essential components of packages, and talent agencies are the primary providers of packaging. Similarly, WGA's agency-affiliate content ban (also enforced by WGA's market power over writers) has unreasonably restrained competition in the market for the development of scripted shows and movies in the United States, and the market for the employment of writers and other artists in the United States, by eliminating agency-affiliates as competitors with traditional studios.

52.     WGA's unlawful boycott has also unreasonably restrained competition in the market for writer representation services in the United States, excluding the majority of talent agencies from the market and preventing writers from working with agents of their choice. There are no substitutes for the representation services provided in this market and there is no cross-elasticity of demand with managers or lawyers or other potential representatives because, under California, New York, and a number of other state laws, only licensed talent agents may independently procure employment for writers in their negotiations with studios. WGA's boycott has also conferred an anticompetitive benefit on those who remain in the market, including talent agencies

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 16 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1  that have combined with the WGA and unlicensed lawyers and managers working
2  pursuant to the WGA's purported delegation of authority.

3       53.    There is no pro-competitive justification for banning agency packaging
4  and agency-affiliate content production and distribution, much less a justification
5  outweighing the anticompetitive effects. Here, the only competitive effect of the
6  challenged restraints is to eliminate UTA and other agencies who refuse to sign the
7  Code of Conduct as competitors in the relevant markets. These restraints on their face
8  thus reduce—not enhance—competition. And even if there were some pro-
9  competitive justification for WGA's boycott, WGA could achieve any such objective
10  through far less restrictive alternatives, such as tailored regulations addressing
11  conflicts of interest of the type in the AMBA or in ATA's proposal.

12       54.    UTA has suffered and will continue to suffer irreparable antitrust injury
13  to its business and property as a direct and proximate result of WGA's unlawful
14  conspiracy. WGA's group boycott has caused UTA to lose work, clients,
15  commissions, and packaging fees that it would have earned absent WGA's illegal
16  conduct. Damage to UTA as a result of WGA's unlawful conduct is ongoing, and
17  UTA will prove the amount of damages it has suffered as a result of WGA's antitrust
18  violation at trial. WGA's boycott has also harmed artists and consumers by reducing
19  output of new shows.

20       55.    WGA's group boycott is not exempt from the antitrust laws because (1)
21  WGA has combined with non-labor entities to enforce and sustain its boycott, and (2)
22  WGA's boycott is not in furtherance of a legitimate union interest. WGA's blanket
23  ban on packaging and agency content affiliates goes far beyond the labor market for
24  writer services and does not fall within WGA's labor law authority, nor does it bear
25  any resemblance to traditional collective bargaining activities.

26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 17 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

## **PRAYER FOR RELIEF**

WHEREFORE, UTA respectfully requests that the Court enter judgment against WGA:

1.      Declaring that WGA's bans on agency packaging and content affiliates, and concerted refusal to deal and group boycott to enforce these bans, is an illegal contract, combination, or conspiracy constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.      Permanently enjoining the challenged conduct;

3.      Awarding UTA treble damages for the injury caused by WGA, in an amount to be proven at trial;

4.      Awarding UTA its costs and attorney's fees, in an amount to be proven at trial;

5.      Awarding pre-and post-judgment interest at the maximum rate allowable; and

6.      Ordering such other and further relief as the Court may deem just and equitable.

Dated: June 27, 2019                      Respectfully submitted,

                                          IRELL & MANELLA LLP

                                          MITCHELL SILBERBERG & KNUPP LLP

                                          By: /s/ *Steven A. Marenberg*
                                          Steven A. Marenberg

                                          Attorneys for Plaintiff
                                          United Talent Agency, LLC

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

- 18 -

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT

1
2
3

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff UTA demands trial by jury on all issues so triable.

4

Dated: June 27, 2019                    Respectfully submitted,

5

6                                                       IRELL & MANELLA LLP

7                                                       MITCHELL SILBERBERG & KNUPP
8                                                       LLP

9

10                                                     By: /s/ *Steven A. Marenberg*

11                                                            Steven A. Marenberg

12                                                            Attorneys for Plaintiff
                                                               United Talent Agency, LLC
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10684794

COMPLAINT FOR VIOLATION OF SECTION 1 OF THE
SHERMAN ACT